## TAYLOR v. SALT CREEK CONSOL. OIL CO. et al.

(Circuit Court of Appeals, Eighth Circuit. November 15, 1922.)

No. 6122.

1. **Equity ⬦84—Laches depends upon circumstances of individual case.**

   The doctrine of laches is not arbitrary, as are the statutes of limitation applicable to actions at law, and its applicability must depend on the circumstances of each particular case.

2. **Equity ⬦88—Laches applies, though not pleaded or raised by demurrer.**

   The court will apply the doctrine of laches in proper case, even though it is not pleaded and the bill is not demurred to.

3. **Equity ⬦80—Party preventing assertion of rights by another cannot claim laches.**

   One party who prevents another from asserting his right cannot be heard to claim the other party to be guilty of laches.

4. **Equity ⬦67—Laches depends upon inequity of enforcing claims after want of due diligence.**

   The doctrine of laches rests upon the inequity of permitting a claim to be enforced where the party asserting the same has not been diligent, and the enforcement under conditions at the time the attempt is made would result in injustice.

5. **Equity ⬦84—In suit concerning oil property laches applied more rigorously.**

   Under the equitable doctrine of laches the nature of the property in dispute may require more prompt action than otherwise, and this is especially true as to mining and particularly as to oil properties, whose value is speculative and may fluctuate very rapidly within a short time.

6. **Trusts ⬦365(5)—Laches applies with strictness to attempts to impose constructive trusts.**

   Where a party seeks to impose upon another a constructive trust, the rule as to diligence to avoid the defense of laches is applied with strictness.

7. **Mines and minerals ⬦38(5)—Great vigilance required to protect rights to mining property based on parol contract.**

   Where a party's claim to mining property is based on an oral contract, great vigilance is required of him in asserting his rights.

8. **Equity ⬦346—Burden of proving diligence is on plaintiff if action at law would be barred.**

   In an application of the doctrine of laches to suits in equity, the burden is placed upon plaintiff to prove diligence in asserting his rights if an action at law would be barred by limitations, but is on defendant to show want of diligence if the statute of limitations has not run against an action at law.

9. **Limitation of actions ⬦43—Cause of action accrues when plaintiff can apply to courts for redress.**

   A cause of action accrues within the statute of limitations when the plaintiff had the right to apply to the court for relief or for redress.

10. **Limitation of actions ⬦46(6)—Cause of action of mining partner accrued when he was excluded from participation.**

    The cause of action of one of three partners to a mining partnership for the prospecting of oil lands accrued at the time he was excluded from participation in the mining operations or sharing in the profits.

11. **Equity ⬦82—Instituting former suit considered on question of laches.**

    Where plaintiff relied upon the institution of a prior suit against defendant to defeat the defense of laches, his delay in instituting the prior suit, even though it was not sufficient to bar that suit on the ground of

⬦For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

laches, may be considered in determining whether the subsequent suit was begun with reasonable diligence.

12. Equity ⟨⟩82—Institution of prior suit without diligent prosecution does not excuse laches.

The mere institution of a prior suit without undue delay after the cause of action arose does not of itself excuse laches in bringing a subsequent suit, if the prior suit was not prosecuted with diligence.

13. Equity ⟨⟩80—Waiting for outcome of other litigation affecting value of property does not excuse delay.

Plaintiff's delay in instituting suit to protect his right under a mining partnership agreement for the development of oil claims was not excused by the fact that he was waiting the outcome of litigation between the United States and the other partners to determine their rights to the claim, which indicated an intention on plaintiff's part to assert his claim only in the event the partners were successful in their litigation.

14. Equity ⟨⟩75—An ineffectual attempt to protect rights in public land office held not excuse for delay.

An attempt by a claimant of an interest as partner in an oil claim to assert his claim in proceedings in the land office to secure a lease under the Leasing Act of 1920, which was made eight years after the alleged exclusion of him from the partnership property and after the parties owning the claim had changed, and was a mistaken remedy, does not excuse his failure to institute a suit to protect his rights before the disposition of land office proceedings.

15. Mines and minerals ⟨⟩38(5)—Suit to establish partnership in oil lands based on oral contract held barred by laches.

Where plaintiff claimed an interest as partner in an oil claim, but his cause of action accrued in 1912, and a suit instituted by him two years thereafter was subsequently dismissed for want of prosecution, notwithstanding which he waited until 1921 to file another suit for the assigned reason that he was waiting the outcome of a litigation with the United States affecting a title to the property, and in the meantime his alleged partners had transferred their interests in the property, apparently without adverse claim by him, his cause of action, if any, was barred by laches.

Appeal from the District Court of the United States for the District of Wyoming; John A. Riner, Judge.

Suit by Robert Taylor against the Salt Creek Consolidated Oil Company and others, begun in the state court, and removed to the District Court of the United States. From a decree dismissing the bill of complaint, plaintiff appeals. Affirmed.

Harvey Riddell, of Denver, Colo., for appellant.

Paul P. Prosser, of Denver, Colo. (Dines, Dines & Holme, Tyson S. Dines, John D. Clark, and Frederick D. Anderson, all of Denver, Colo., on the brief), for appellees.

Before LEWIS and KENYON, Circuit Judges, and YOUMANS, District Judge.

KENYON, Circuit Judge. This is an appeal from the judgment and decree of the District Court of the United States for the District of Wyoming dismissing appellant's bill of complaint which was filed May 6, 1921, in the district court of Natrona county, Wyo., against the Salt Creek Consolidated Oil Company, the Midwest Oil Company, the Midwest Refining Company, William Hanley, Eula I. Hammond,

and Willa B. Hammond. Parties will be designated as in the trial court.

The cause was removed from the state court to the District Court of the United States for the District of Wyoming.

August 8, 1921, the cause was dismissed as to defendants Eula I. Hammond and Willa B. Hammond. No service has been secured on defendant William Hanley. The motion to dismiss was on the ground that the petition failed to set forth facts sufficient to constitute a valid cause of action in equity as against the defendants, and also that said petition discloses upon its face that plaintiff was guilty of laches. Other reasons were set forth in the motion, but these were the two main ones. The court sustaining the motion, which is in the nature of a general demurrer, the facts contained in the complaint and well pleaded are to be taken as true for the purposes of this appeal, and such facts are substantially as follows:

In 1899 certain persons located the northeast quarter of section 3, township 39 north, range 79 west of the sixth principal meridian, Natrona county, Wyo., as an oil placer claim. The rights, if any, secured by such location were transferred to defendant William Hanley and to one J. B. Bradley. In March, 1912, said Hanley and Bradley met with plaintiff, Taylor, at the Brown Hotel in Denver for the purpose of considering and agreeing upon a plan for the exploitation of said land for oil. It was then and there agreed between plaintiff, Taylor, and said Hanley and Bradley that the three would jointly go into the business of exploiting and developing such land for oil, and that they then formed what was in effect a mining partnership for said purpose. That certain apparatus was purchased and paid for by Hanley and set up on the land under the supervision of Bradley on or about June 1, 1912, and at such date the drilling operations commenced. On July 7, 1912, oil in large quantities was struck on the premises and a large flow of oil subsequently therefrom was produced in amount beyond the control of those engaged in the drilling. At no time did Hanley draw upon Taylor for Taylor's proportion of the expense, and no money was paid by Taylor, but he was ready and willing at all times to pay his part. Defendant Hanley excluded Taylor at all times from any participation in the working of said premises and from any participation in the profits arising therefrom.

April 4, 1914, Taylor filed his petition against Hanley, Bradley, the Midwest Oil Company and others in the district court of Natrona county, Wyo., seeking to enforce his rights in the profits arising from the operations on said land. This cause was removed to the United States District Court for the District of Wyoming. An answer was filed by all defendants except the Midwest Oil Company; it being stipulated as to that company that its answer need not be filed until the further progress of the case. This case was pending in the United States District Court of Wyoming until on or about May 15, 1916, when the same was dismissed by the court without prejudice to the institution of a new suit.

September 27, 1909, the President of the United States issued an order withdrawing certain public oil land from location, and the land

hereinbefore described was included in the list of lands. In a suit instituted by the United States against the Midwest Oil Company in the United States Court for the District of Wyoming, the court determined that said "withdrawal order" was invalid, and that decision had not been reversed at the time Taylor commenced his action against Hanley on the 4th day of April, 1914. February 23, 1915, the Supreme Court of the United States reversed the decision of the United States District Court of Wyoming and held said withdrawal order valid.

On the 28th day of August, 1915, the United States filed a bill in equity in the United States District Court for the District of Wyoming against Hanley, the Midwest Oil Company, and the Midwest Refining Company et al., for the purpose of obtaining a decree that the lands hereinbefore described were lawfully withdrawn from mineral location by reason of said federal order of September 27, 1909. This cause seems to have been pending in the court until April 18, 1921. Both the case of Taylor v. Hanley and the case of the United States v. Hanley et al. were for a considerable period pending in the same court at the same time. At the time of the institution of the action by the government, August 28, 1915, it was ordered by the court, pursuant to stipulations, that the oil taken from the land be disposed of and the proceeds deposited in the bank subject to the order of the court. Plaintiff, Taylor, did not intervene in said action.

September 4, 1915, a corporation called the New Bradford Oil Company was organized under the laws of the state of Wyoming. J. B. Bradley conveyed his interest in said aforedescribed lands to the New Bradford Oil Company, and Hanley likewise conveyed his interest to the New Bradford Oil Company. The deed from Hanley to the New Bradford Oil Company was in pursuance of a contract between Hanley and the persons who subsequently formed the defendant Salt Creek Consolidated Oil Company, and it is claimed that the contract was made for the benefit of said company. The defendant Salt Creek Consolidated Oil Company was organized as a corporation of the state of Maine on or about the 8th of September, 1919, and was authorized to do business in the state of Wyoming. October 1, 1919, the New Bradford Oil Company conveyed all its right, title, and interest in and to said land to the Salt Creek Consolidated Oil Company. A large amount of money arising from the proceeds of the oil produced from said land was impounded in the bank under order of court.

In 1920 Congress enacted what was called the "Leasing Bill," the same being approved February 25, 1920 (41 Stat. 437). Under the provisions of section 18a of said bill offers of compromise and settlement with the United States could be made in controversies involving the validity of oil placer claims. In July, 1920, the Salt Creek Consolidated Oil Company, Willa B. Hammond, and Eula I. Hammond made an offer of compromise and settlement. Plaintiff, Taylor, set up his claim then to one-third of the profits from the oil produced or that might be produced. This compromise offer appears to have been later abandoned.

August 23, 1920, defendant Salt Creek Consolidated Oil Company applied for a lease on the land under the provisions of section 18 of said Leasing Bill. Taylor set up his claim within the time specified by law to a one-third interest in the oil from said land produced or to be subsequently produced. Hearing was had before the Commissioner of the General Land Office, and Taylor's claim was dismissed. Appeal was taken by Taylor to the Secretary of the Interior, and on December 3, 1920, the decision of the Commissioner of the General Land Office was affirmed. After such decision a lease was made and delivered on or about March 10, 1921, to the Salt Creek Consolidated Oil Company, Eula I. Hammond, and Willa B. Hammond, to take effect as of August 23, 1920.

It is claimed further that defendant Midwest Oil Company or defendant Midwest Refining Company has a claim or contract with the Salt Creek Consolidated Oil Company and with the Hammonds under which the Midwest Oil Company and the Midwest Refining Company take the oil produced at a price fixed by said contract.

A number of important questions are raised. It is insisted by defendants that Taylor, Hanley, and Bradley never formed a binding mining partnership; that what they did constituted an executory agreement to form a partnership, and that the same was never launched; that plaintiff's remedy is an action at law for breach of the alleged agreement of partnership; that Hanley and Bradley are indispensable parties; and that the bill of complaint shows on its face that plaintiff was guilty of laches. As our conclusion is that the question of laches is determinative of this case, there is no necessity for considering the others.

[1] The doctrine of laches has been applied by the courts in so many cases that to review even a small percentage of them would unduly extend any opinion. It is to the interest of society that claims against members thereof be prosecuted with due diligence. Hence we have in law statutes of limitation, arbitrary in their operation. In equity we have the doctrine of laches, not arbitrary as statutes of limitation are, but founded on justice and flexible in its application. It is entirely a defense in equity. The circumstances under which the doctrine of laches is applied are so numerous and different that its applicability must depend on the circumstances of each particular case. In Abraham v. Ordway, 158 U. S. 416, 420, 15 Sup. Ct. 894, 895 (39 L. Ed. 1036), the court says:

"Whether equity will interfere in cases of this character must depend upon the special circumstances of each case. Sometimes the courts act in obedience to statutes of limitations; sometimes in analogy to them. But it is now well settled that, independently of any limitation prescribed for the guidance of courts of law, equity may, in the exercise of its own inherent powers, refuse relief where it is sought after undue and unexplained delay, and when injustice would be done, in the particular case, by granting the relief asked. It will, in such cases, decline to extricate the plaintiff from the position in which he has inexcusably placed himself, and leave him to such remedies as he may have in a court of law."

In Galliher v. Cadwell, 145 U. S. 368, 371–372, 12 Sup. Ct. 873, 874 (36 L. Ed. 738), it was said by the court:

"And the question of laches turns not simply upon the number of years which have elapsed between the accruing of her rights, whatever they were, and her assertion of them, but also upon the nature and evidence of those rights, the changes in value, and other circumstances occurring during that lapse of years. The cases are many in which this defense has been invoked and considered. It is true that by reason of their differences of fact no one case becomes an exact precedent for another, yet a uniform principle pervades them all."

In Jackson v. Jackson, 175 Fed. 710, 719, 99 C. C. A. 286, 295, it is said:

"Every case depends on its own circumstances in determining the lapse of time essential to make applicable the doctrine of laches. It will be applied in cases where only a short period of time has elapsed, where the conditions surrounding the property in controversy have changed, especially those relating to its value, and affecting injuriously the interests of innocent defendants."

In this case a delay of three years in asserting an interest in oil land was held laches.

In Société Foncière et Agricole des Etats Unis v. Milliken, 135 U. S. 304, 10 Sup. Ct. 823, 34 L. Ed. 208, it was held that a delay of two years in commencing proceedings to set aside a judgment for usury constituted laches.

In Twin-Lick Oil Co. v. Marbury, 91 U. S. 587, 23 L. Ed. 328, a delay of approximately four years was held a bar to the action. In Pittsburgh & Lake Angeline Iron Co. v. Cleveland Iron Mining Co., 178 U. S. 270, 20 Sup. Ct. 931, 44 L. Ed. 1065, a delay of 2½ years was held fatal. In Patterson v. Hewitt, 195 U. S. 309, 319, 25 Sup. Ct. 35, 37 (49 L. Ed. 214) the court said:

"Indeed, in some cases the diligence required is measured by months rather than by years. * * * And in others a delay of two, three or four years has been held fatal."

In Brown v. County of Buena Vista, 95 U. S. 157, 24 L. Ed. 422, a delay of seven years precluded the action. In Holgate v. Eaton, 116 U. S. 33, 6 Sup. Ct. 224, 29 L. Ed. 538, two years, under the peculiar circumstances of that case, was held to be laches. See, also, Hayward v. National Bank, 96 U. S. 611, 618, 24 L. Ed. 855; Buchler v. Black et al., 226 Fed. 703, 141 C. C. A. 459. These cases, without further multiplying them, sustain the doctrine fully that each case is determined by its own peculiar circumstances.

[2] The doctrine of laches is so firmly founded as a part of our jurisprudence that the court applies the same even though it may not be pleaded or the bill demurred to. In Willard v. Wood, 164 U. S. 502, 524, 17 Sup. Ct. 176, 181 (41 L. Ed. 531) the court held:

"But the recognized doctrine of courts of equity to withhold relief from those who have delayed the assertion of their claims for an unreasonable length of time may be applied in the discretion of the court, even though the laches are not pleaded or the bill demurred to."

See, also, Badger v. Badger, 2 Wall. 87, 89, 17 L. Ed. 836.

[3] One party who prevents another from asserting his right cannot be heard to claim the party to be guilty of laches. Boyd v. Northern

Pac. Ry. Co. (C. C.) 170 Fed. 779, 808; Id., 228 U. S. 482, 33 Sup. Ct. 554, 57 L. Ed. 931.

[4] Some cases hold that merely long delay, not satisfactorily explained, either in commencing a suit or prosecuting a suit, may constitute laches (Bankers' Trust Co. v. Virginia Ry. & Power Co. et al. [C. C. A.] 273 Fed. 999, 1003); others that the doctrine of laches applies only where the delay has lulled the adverse party into doing something which he would not otherwise have done; in other words, no laches unless prejudice is shown to other party (Brissell v. Knapp [C. C.] 155 Fed. 809; Richardson et al. v. Green et al., 61 Fed. 423, 9 C. C. A. 565; Pacific R. R. of Missouri v. Atlantic & P. R. Co. [C. C.] 20 Fed. 277; Williamson et al. v. Monroe et al. [C. C.] 101 Fed. 322).

Many of the best-reasoned cases proceed on the theory that laches is not a mere matter of length of time as in statutes of limitation, but "principally a question of the inequity of permitting the claim to be enforced—an inequity founded upon some change in the condition or relations of the property or the parties." Galliher v. Cadwell, 145 U. S. 368, 373, 12 Sup. Ct. 873, 875 (36 L. Ed. 738); Stevens et al. v. Grand Central Min. Co. et al., 133 Fed. 28, 67 C. C. A. 284. Others lay down the rule that the test really is: Was there due diligence in prosecuting the suit, or was there such a lack of diligence under circumstances that in equity the party should be precluded from asserting his claim? In Townsend v Vanderwerker, 160 U. S. 171, 186, 16 Sup. Ct. 258, 262 (40 L. Ed. 383), the court said:

"The question of laches does not depend, as does the statute of limitation, upon the fact that a certain definite time has elapsed since the cause of action accrued, but whether, under all the circumstances of the particular case, plaintiff is chargeable with a want of due diligence in failing to institute proceedings before he did. In this case we think the delay is fully explained."

In this circuit the rule has been settled in a number of cases. In Minnesota Mut. Inv. Co. v. McGirr et al. (C. C. A.) 263 Fed. 847, 855, the court says:

"In answer to this contention, it is sufficient to say that mere lapse of time never constitutes laches, but in addition the court must find that it would be inequitable to grant the relief prayed for."

Same doctrine, Schwartz v. Loftus et al., 216 Fed. 320, 132 C. C. 464; Meyer et al. v. Ritter (C. C. A.) 268 Fed. 937, 943.

It was said by this court in Drees v. Waldron et al., 212 Fed. 93, 95, 128 C. C. A. 609, 611:

"The doctrine of laches protects against a proceeding instituted or prosecuted without diligence and where the delay and thus the fault of one party results in an unfair advantage over his adversary. The existence of laches is primarily determined, not by lapse of time, but by considerations of justice."

The general purpose of the doctrine is well stated in Naddo v. Bardon et al., 51 Fed. 493, 495, 2 C. C. A. 335, 337, where the court said:

"No doctrine is so wholesome, when wisely administered, as that of laches. It prevents the resurrection of stale titles, and forbids the spying out from the records of ancient and abandoned rights. It requires of every owner that he take care of his property, and of every claimant that he make known his

claims. It gives to the actual and longer possessor security, and induces and justifies him in all efforts to improve and make valuable the property he holds. It is a doctrine received with favor, because its proper application works out justice and equity, and often bars the holder of a mere technical right, which he has abandoned for years, from enforcing it when its enforcement will work large injury to many."

While the holdings of the courts as indicated by these cited cases may differ slightly, through them all runs a similar principle, viz: The inequity of permitting claims to be enforced where the party asserting the same has not been diligent and the enforcement under conditions at the time the attempt is made would result in injustice.

Many elements bear upon the question of due diligence in prosecuting; such, for instance, as the nature of the property in dispute; the nature of the remedy; the kind of agreement sought to be enforced; the nature of the relief demanded. We refer to some of these matters as they bear upon the questions in this case.

[5] The nature of the property in dispute may require more prompt action than otherwise. This is especially true as to mining and oil properties such as the situation in the case at bar. There is a special reason as to these properties why the courts should hold the parties to a rigorous rule as to laches. In Twin-Lick Oil Co. v. Marbury, 91 U. S. 587, 592, 593 (23 L. Ed. 328), it is said by the court:

"The fluctuating character and value of this class of property is remarkably illustrated in the history of the production of mineral oil from wells. Property worth thousands to-day is worth nothing to-morrow; and that which would to-day sell for a thousand dollars as its fair value may, by the natural changes of a week or the energy and courage of desperate enterprise, in the same time be made to yield that much every day. The injustice, therefore, is obvious, of permitting one holding the right to assert an ownership in such property to voluntarily await the event, and then decide, when the danger which is over has been at the risk of another, to come in and share the profit."

In Johnston v. Standard Mining Co., 148 U. S. 360, 370, 13 Sup. Ct. 585, 589 (37 L. Ed. 480), the court said:

"The duty of inquiry was all the more peremptory in this case from the fact that the property of itself was of uncertain character, and was liable, as is most mining property, to suddenly develop an enormous increase in value."

Speaking of mining properties, in Patterson v. Hewitt, 195 U. S. 309, 321, 25 Sup. Ct. 35, 38 (49 L. Ed. 214), the court says:

" * * * Persons having claims to such property are bound to the utmost diligence in enforcing them, and there is no class of cases in which the doctrine of laches has been more relentlessly enforced."

In Reed v. Munn et al., 148 Fed. 737, 760, 80 C. C. A. 215, 238 (this circuit), referring to this class of property, the court uses the following language:

" * * * A class of property which, because of its well-known constantly vacillating character may be practically worthless to-day, and under the energy and expenditure of money by an after-taker and claimant, in a brief period may develop the presence of vast wealth in ore. In respect of such a claim equity demands that the claimant should be awake to his rights, prompt in their assertion, and eager in their pursuit, lest his slothfulness and indifference work a great wrong to innocent parties."

· In Childs v. Missouri, K. & T. Ry. Co., 221 Fed. 219, 222, 136 C. C. A. 629, 632, the court said:

"And when the property involved is of a speculative nature, such as mining property usually is, a court of equity will refuse to grant relief even when the suit is instituted before the bar of the statute of limitation had attached."

In Buchler v. Black et al., 226 Fed. 703, 707, 141 C. C. A. 459, 463, it was said:

"Again, the rule which requires prompt action is held especially applicable in cases in which a sale of mining property is involved."

The doctrine is well settled, both in the English courts and the courts of this country, as to the relentless enforcement of the doctrine of laches where the subject of controversy is mining and oil property, purely speculative in value. Stevens et al. v. McChrystal et al., 150 Fed. 85, 89, 80 C. C. A. 39; Brissell v. Knapp (C. C.) 155 Fed. 809, 812; Sturm et al. v. Wiess et al. (C. C. A.) 273 Fed. 457; Buchler v. Black et al., 226 Fed. 703, 707, 141 C. C. A. 459; Hayward v. National Bank, 96 U. S. 611, 24 L. Ed. 855.

[6] The nature of the relief demanded bears heavily on the question of diligence and laches. Where a party, as here, seeks to impose upon another a constructive trust, the rule as to diligence is applied with strictness. In Wetzel et al. v. Minnesota Railway Transfer Co. et al., 65 Fed. 23, 26, 12 C. C. A. 490, 493, it is said:

"This latter rule, requiring a suitor to plead and prove some adequate excuse for his silence and inaction in every instance where there has been an apparent want of diligence, is applied and enforced with great strictness in those cases where a person seeks to fasten upon another a constructive trust with respect to personal or real property, and in those cases, as well, where the property in controversy has rapidly appreciated in value, or has been improved by those in possession, or when the rights of numerous third parties have intervened and attached."

See 8 De G., M. & G., 784, 44 Eng. R. 593.

[7] Likewise great vigilance is required where claimants are asserting rights arising out of mining properties where such rights are based upon parol contracts. In Stevens et al. v. McChrystal et al., 150 Fed. 85, 89, 80 C. C. A. 39, 43, speaking through Philips, Judge, this court says:

"Under the statute of Utah (Rev. St. 1898, § 2875) actions on written instruments, upon contracts, obligations, or liability founded upon written instruments are barred by limitation after the lapse of six years. And, as applied to property like mines in Utah, the value of which is very fluctuating, courts of equity exact of claimants asserting rights therein, based upon contracts parol in character, a degree of vigilance and early, energetic action in enforcing such claims wholly wanting in this case."

In the case at bar an attempt is made to establish a constructive trust arising out of a parol agreement, and the language of these cases is peculiarly appropriate.

[9] The rule governing courts of equity in the application of the doctrine of laches has been set forth by this court in Wilson v. Plutus Mining Co. et al., 174 Fed. 317, 320, 98 C. C. A. 189, 192, as follows:

"Under ordinary circumstances a suit in equity will not be stayed before, and will be stayed after, the time fixed by the analogous limitation at law;

but if unusual conditions or extraordinary circumstances make it inequitable to allow the prosecution of a suit after a briefer, or to forbid its maintenance after a longer, period than that fixed by the statute, the chancellor will not be bound by the statute, but will determine the extraordinary case in accordance with the equities which condition it. When a suit is brought within the time fixed by the analogous statute, the burden is on the defendant to show, either from the face of the bill or by his answer, that extraordinary circumstances exist which require the application of the doctrine of laches, and, when such a suit is brought after the statutory time has elapsed, the burden is on the complainant to show, by suitable averments in his bill, that it would be inequitable to apply it to his case."

Also Childs v. M., K. & T. Ry. Co., 221 Fed. 219, 222, 136 C. C. A. 629.

[9] Under this rule, if the cause of action arose more than eight years before the suit was brought, the burden was on plaintiff to show by suitable averments in his bill that it would be inequitable to apply the doctrine of laches; the statute of Wyoming providing that actions upon a contract not in writing must be brought within eight years after the cause of action accrues. This raises the very important question in this case: When did the cause of action accrue? The answer is, when the plaintiff had the right to apply to the court for relief or for redress. Stevens et al. v. McChrystal et al., 150 Fed. 85, 88, 80 C. C. A. 39.

[10] Paragraph 10 of the complaint as filed contains the following:

"* * * Nevertheless plaintiff says the defendant Hanley excluded this plaintiff from any participation in the working of said premises, and from participating in the profits therefrom, and from having anything to do or interest in the working of said lands, or the profits arising therefrom."

From this paragraph it is apparent that the defendant Hanley excluded the plaintiff from any participation whatever in the working of the premises. Under allegation 9 of the complaint it is alleged that drilling operations were commenced on the land June 1, 1912, and oil was struck July 7, 1912. One of the alleged partners therefore from the very beginning excluded one of the other partners from the working of the premises and from any participation in the profits. Hence it is clear that plaintiff must have been excluded from any participation at least in June and July, 1912. Then his cause of action arose. Then he should within a reasonable time have gone into court and sought to enforce his rights. The present action was commenced on May 6, 1921, which is approximately eight years and ten months from the time the cause of action accrued. The situation of some of the parties had changed; the interest of the claimed partners had been transferred; and a new party had succeeded to their rights, if any rights they had. If these constituted all the facts, the case would clearly be subject to the doctrine of laches. The long delay, especially in view of the character of the claim and the change of some of the parties affected, requires explanation.

Why, under these circumstances, is it inequitable to apply the doctrine of laches? What is the excuse for the delay and what is the explanation? Three matters are urged: First, the institution of a suit by Taylor against Hanley; second, the suit of the United States against Hanley and the delay therein; and, third, the attempt of Taylor to se-

cure his rights before the General Land Office when the application was made for a lease by the Salt Creek Consolidated Oil Company. Let us consider these matters.

[11] The suit of Taylor against Hanley for an accounting was commenced on the 4th day of April, 1914, lacking about two months of two years after his cause of action had accrued. With property of the nature of that in suit, namely, oil land or the products thereof where the value was fluctuating and changeable, worthless one day and highly remunerative the next, this in itself was a delay of serious magnitude. We do not say that it was necessarily sufficient to constitute laches, but it is an unexplained delay, and might under certain conditions be sufficient in itself to constitute laches. It is an element in any event to be taken into consideration in the determination of the general question of laches under all the facts and circumstances of the case.

[12] The mere bringing of the suit would not relieve Taylor from the charge of laches. It was his duty to prosecute the suit with diligence, and the courts have frequently held that, if a party fails to prosecute his suit with diligence as far as the doctrine of laches is concerned, and as an excuse therefor, it is as if no action had been brought. In Johnston v. Standard Mining Co., 148 U. S. 360, 370, 13 Sup. Ct. 585, 589 (37 L. Ed. 480), it is said:

"It has been frequently held that the mere institution of a suit does not of itself relieve a person from the charge of laches, and that, if he fail in the diligent prosecution of the action, the consequences are the same as though no action has been begun."

In Willard v. Wood, 164 U. S. 502, 525, 17 Sup. Ct. 176, 181 (41 L. Ed. 531), the court said:

"The mere fact that the bill was left on the files would not, in itself, relieve from the effects of laches, for failure in diligent prosecution may have the same consequences as if no suit has been instituted."

Northrup v. Browne, 204 Fed. 224, 231, 122 C. C. A. 496, 503 (this circuit), is a case where no steps had been taken to prosecute the bill for six years. The court held that the defendant was guilty of laches not only before filing the bill, but in not prosecuting the same with reasonable diligence, and says:

" * * * For the law is well settled that the mere institution of a suit does not relieve a person from the charge of laches, and if he fails in its diligent prosecution the consequences are the same as if no action had been begun."

The mere fact of asserting a claim is not sufficient to keep the same alive. Mackall v. Casilear, 137 U. S. 556, 11 Sup. Ct. 178, 34 L. Ed. 776.

This case remained upon the docket in the United States District Court of Wyoming from May 25, 1914, until May 16, 1916, when the court entered an order dismissing the same, which order was as follows:

"This cause comes on this day to be heard upon stipulation for continuance or dismissal, William E. Mullen, Esq., presenting said stipulation, and

"It is ordered by the court that this cause be, and the same is hereby, dis-

missed, without prejudice, upon payment of costs, as per stipulation this day filed herein.                                    John A. Riner, Judge.
    Indorsed: "Filed in the District Court on May 15. 1916."

It is important to seek a reason for the delay in the prosecution of this case, and as to whether or not the delay was excusable.

On September 27, 1909, the President of the United States issued what was known as a "withdrawal order," which order withdrew from location certain public oil lands covering the land upon which Bradley and Hanley claimed the rights of exploitation. Subsequently the United States District Court of Wyoming in a suit of the United States against the Midwest Oil Company held the federal order invalid. The action commenced by Taylor against Hanley, Bradley, and others on April 4, 1914, was commenced during the time that the decision of the United States District Court stood and before the reversal by the Supreme Court of the United States, which was on February 23, 1915. A part of the time that this suit was pending it is to be remembered that the suit of the United States v. Hanley, Midwest Oil Co., Midwest Refining Company et al., to clear the title of the United States and to have an accounting, was also pending. Counsel for appellant in his brief, page 28, explains that after the decision of the Supreme Court there was doubt in the oil countries as to what should be the course of proceeding.

"* * * And it was commonly supposed that some relief bill of some kind would be passed by Congress, and there was a general cessation of pressing the trial of suits coming within that withdrawal order until there could be light upon the subject. Taylor, in the original suit, had that same feeling— was uncertain what course to take, and, like everybody else, let the case rest for a little while until he could get more light on the matter."

And as to the case of the United States v. Hanley et al. counsel states in his brief very clearly and frankly as follows:

"The withdrawal order excepted from its operation locations and claims made and then existing in good faith, and the case by the United States would rest on whether the location claimed by Hanley and Bradley was of that kind. It would decide whether Hanley and Bradley, under whom Taylor claimed, had a valid claim or not, or whether, as said by the court in dismissing the case, the question had become merely moot. Evidently it would not be expected for the parties to proceed with the case, with large expense of time and money, when there was pending a case that would disclose whether they had anything to fight about."

These two quotations set forth the reasons why Taylor did not push his case against Hanley to a conclusion, and also the reason for awaiting a decision in the suit of the United States v. Hanley et al. Are these reasons sufficient to excuse the long delay or series of delays?

[13] There was no reason that we can see why Taylor could not have prosecuted his suit against Hanley and at least have determined the partnership and accounting questions. He was asserting the right to one-third of the profits under the alleged partnership agreement, and his right had been denied since June or July, 1912. While it might not, in his judgment, have been wisdom to go on with said suit in view of the holding of the Supreme Court of the United States, there was nothing to prevent in said suit the establishment of the partnership re-

lation, and the right to an accounting provided Taylor had secured rights in the oil produced and to be produced from the land. The decision of the Supreme Court affected those who were making claims under the entries. Taylor was not one of these. He let the suit rest and did not intervene in the pending suit of the government against Hanley, evidently because he could not determine just where the advantage would lie. The rights of Taylor as between Hanley, Bradley, and himself were not directly involved in the suit of the government against Hanley. If Taylor had established his rights theretofore as to Hanley, and if in the government suit Hanley had been successful, Taylor would have been benefited. Taylor could have intervened in the suit of the government against Hanley pending in the same court, before the same judge, at the same time as his suit against Hanley. There the proceeds of the oil in which he claimed an interest were being impounded. He said nothing. He waited silently for the result of the litigation. It was to his advantage not to participate in that case; not to make his alleged claim known, because, if he was in fact a partner, and the judgment had run against Hanley and Bradley, he might be liable for damages. He waited to see if there was anything to fight about. He waited also to see if there was to be remedial legislation on the part of the government. It was a period of speculative watchful waiting on his part. Such speculative waiting is not favored in equity, especially in property of this character, and we do not regard it a sufficient excuse for failing to more diligently prosecute his claim. 20 Ruling Case Law, p. 1059, § 303, lays down the rule as follows:

"In a business of highly speculative character such as mining, a partner who stands by and takes no decided step for assertion of his rights will not be allowed, after a considerable period, and, when the success of the venture is assured by the exertions of the remaining partners, to claim his share of profits as a partner."

In Curtis et al. v. Lakin et al., 94 Fed. 251, 256, 36 C. C. A. 222, 226, the court said:

"In cases of the latter kind, courts of equity will refuse to grant relief if the complainant has failed to bring suit for a comparatively short period after the denial of his rights became known to him, unless a good excuse is offered for such delay; and they will more readily hold that the cause of action is barred by laches if it appears that the failure to sue was occasioned, in whole or in part, by a desire on the part of the complainant to ascertain how development work in progress on the property would affect its value. Where delay is occasioned by motives of the latter sort—that is, by waiting to see whether developments undertaken by those in possession will be successful or otherwise—a litigant is justly chargeable with bad faith, which courts of chancery always aim to discourage."

In McCabe v. Matthews, 155 U. S. 550, 556, 15 Sup. Ct. 190, 192 (39 L. Ed. 253), it is said:

"It seems to us to be a case of a purely speculative contract on the part of the plaintiff; doing nothing himself, he waits many years to see what the outcome of the purchase by defendant shall be. If such purchase proves a profitable investment, he will demand his share; if unprofitable, he will let it alone. Under those circumstances the long delay is such laches as forbids a court of equity to interfere."

See, also, Sturm et al. v. Wiess et al. (C. C. A.) 273 Fed. 457; Mackall v. Casilear, 137 U. S. 556, 11 Sup. Ct. 178, 34 L. Ed. 776; Patterson v. Hewitt, 195 U. S. 309, 25 Sup. Ct. 35, 49 L. Ed. 214; Brissell v. Knapp (C. C.) 155 Fed. 809, 812; Reed v. Munn, 148 Fed. 737, 760, 80 C. C. A. 215; Stevens v. McChrystal, 150 Fed. 85, 89, 80 C. C. A. 39. The excuse of waiting to see if "they' had anything to fight about" or to "let the case rest for a little while" suggests reasons possibly of prudence, but such are not favored as an excuse for delay. In Lane & Bodley Co. v. Locke, 150 U. S. 193, 201, 14 Sup. Ct. 78, 81 (37 L. Ed. 1049), the court says:

"Courts of equity, it has often been said, will not assist one who has slept upon his rights, and shows no excuse for his laches in asserting them. The plaintiff's excuse, in this instance, that he preferred, for prudential reasons, to receive a salary from the defendant rather than to demand a royalty, is entitled to a less favorable consideration by a court of equity than if his conduct had been that of mere inaction."

Under all the circumstances we believe the suit brought by Taylor against Hanley is of no avail as an explanation of the failure to prosecute his cause of action more diligently, and that the situation as to laches is practically the same as if such suit had not been brought, and that after the decision of the Supreme Court of 1915 holding the "withdrawal order" of public oil lands valid plaintiff abandoned for the time being, at least, his claim.

[14] At the time of the attempt of the Salt Creek Consolidated Oil Company to secure a lease under the Leasing Act of 1920 Taylor did make effort to assert his claim. It was a mistaken remedy, but showed that he still had some notion that his claim might be revived. The parties had to some extent changed in the meantime, and the situation was quite different than at the time of the alleged partnership agreement in 1912, and the effort before the General Land Office and the Secretary of the Interior is not sufficient to excuse the prior delay and want of diligence.

[15] It seems to us that on the face of the complaint plaintiff did not pursue the cause with such diligence as will relieve him from the charge of laches. The cause of action arose in June, 1912. For nearly two years he took no action. This was valuable property producing great quantities of oil, and property the value of which would fluctuate. He remained silent when he should have spoken. The suit which he commenced in April, 1914, was dismissed for want of prosecution in 1916. A suit pending by the government against some of the same defendants in which he could assert his rights was commenced during the time that his suit against Hanley was pending. He did not intervene. After the dismissal of his former suit he took no steps to reinstate it. In view of the nature of the property and in view of the character of the remedy seeking to subject the proceeds of the oil to a constructive trust under and by virtue of the parol agreement, he was required to exercise great diligence in the presentation and prosecution of his claim. While he took some steps such as at the time of the application of the Salt Creek Consolidated Oil Company for a lease, yet that was not sufficient to show any real earnest purpose to enforce

the partnership claim against Hanley and Bradley, and this was long years after his right of action had accrued. It is a fair inference from the record that during the time that he claims to have been a partner and acting under a partnership agreement he had no communication with his partners; that he never demanded any accounting from them, nor an explanation of their exclusion of him from the business. The language of Judge Thayer in Curtis v. Lakin, 94 Fed. 251, 254–255, 36 C. C. A. 222, 225, is singularly in point, and is as follows:

"Men of average intelligence and business sagacity would not ordinarily permit mining property in which they had a large interest, and which they believed to be valuable, to be sold and otherwise dealt with by a third person as his own, without remonstrance on their part, and without seeking for an explanation, unless they were well aware that he asserted a legal right to so deal with it, and that any remonstrance on their part or attempt to obtain a recognition of their rights would be vain and useless, unless it took the form of a suit to enforce their alleged rights. We think, therefore, that the conclusion is well warranted by the allegations of the bill that for more than two years before it was filed the plaintiffs remained silent and inactive, knowing that Lakin claimed the Utah mines as his own, yet intending to assert a title thereto in case they proved to be productive and valuable, but to deny all interest therein and all liability for obligations which Lakin might incur in attempts to develop them, provided they proved to be barren and valueless. This seems to be the only reasonable explanation of the plaintiffs' silence and inaction for a period of two years or more, in view of facts that were then well known to them, when their actions are judged by the tests which are usually applied to determine the motives which prompt human conduct."

This case was tried by the same court in which the former action was brought and the suit of the government against Hanley and others likewise. The court was peculiarly well acquainted with the situation and with the actions of all the parties. It would be difficult to reach any other conclusion in view of all the circumstances of the case than that the complaint is destitute of a sufficient showing of reasonable diligence, and that it would be inequitable to grant the relief prayed for.

The judgment and decree of the trial court is affirmed.